**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

T-MOBILE SOUTH, LLC,       :
      :
          Plaintiff,       :
      :
      v.       :      CIVIL ACTION NO.
      :      1:08-CV-0449-JOF
COWETA COUNTY, GEORGIA,       :
      :
          Defendant.       :

## OPINION AND ORDER

This matter is before the court on Plaintiff's motion for summary judgment [13] and

Defendant's motion for summary judgment [14].

## I.     Background

### A.     Procedural History and Facts

Plaintiff, T-Mobile South, LLC, filed suit against Defendant, Coweta County,

Georgia, pursuant to the Telecommunications Act of 1996 contending that Coweta County's

decision to deny T-Mobile a special use zoning variance for the construction of a

telecommunications tower was not supported by "substantial evidence" as required by the

relevant sections of the Telecommunications Act. The parties filed cross-motions for

summary judgment.

In order to avoid coverage gaps, T-Mobile's engineers determined that a mobile telecommunications monopole (more commonly known as a cell phone tower) was needed in a particular area of Coweta County. With its zoning application, T-Mobile submitted a 12-page Radio Frequency Engineer Site Analysis from one of its engineers setting forth the coverage reasons T-Mobile believed it needed a tower in this area, as well as the manner in which the site was selected, and what coverage would exist after the tower was installed. T-Mobile's engineering report noted that no other existing antennas would handle the coverage gap and that the proposed antenna tower could accommodate three other mobile carriers, in a situation known as co-location.

The lease T-Mobile signed was on a property on Fischer Road in Sharpsburg, Georgia. After signing the lease, T-Mobile began the process of gaining zoning approval for the "monopine" tower. A monopine is a particular type of tower designed to look like a pine tree. The Engineer Site Analysis had pinpointed a "search ring" that would be the "ideal" location for the tower. The property eventually chosen by T-Mobile is, by a small distance, outside this "ideal search ring" which itself has a radius of .36 miles.

The selected property is zoned RC (Rural Conservation). Communications towers are accepted uses under the Rural Conservation permit so long as a special use permit is obtained. T-Mobile filed an application for a special use permit on September 18, 2007. While this was classified as a new application, in 2006, T-Mobile had filed an application

for a monopole in the same location, and public hearings had been held on that application. T-Mobile voluntarily withdrew its application. The instant application is alike in all manners but for the fact that in the new application, the tower is not a monopole but rather a monopine designed to blend in with pine tree backgrounds.

Coweta County's Telecommunications Tower Ordinance sets forth the factors that the Board should consider when evaluating a special use permit for telecommunications towers, including *inter alia*: (b) proximity of tower to residential structures or other incompatible uses such as airports; (d) nature of uses on adjacent and nearby properties; (f) design of tower with respect to elements reducing obtrusiveness; and (i) description of service need, including availability of existing towers. *See* Tower Ordinance, § 69.5(1). A goal of the Tower Ordinance is to "minimize the total number of towers throughout the community."

Section 69.5 also provides that the Board must also consider "those criteria set out for zoning in general." *Id.* Some of these considerations include: (1) existing land use pattern, (6) whether there would be any adverse impact on value, use, enjoyment of adjacent property, (8) aesthetic effect, (11) preservation of integrity of residential neighborhoods, (13) any factors relevant to public health, safety, and general welfare, and (14) whether the proposed special use is consistent with County's Comprehensive Land Use Plan. *Id.*

AO 72A
(Rev.8/82)

Coweta County's professional Planning and Zoning Staff recommended approval of T-Mobile's application subject to certain conditions T-Mobile agreed to implement. After reviewing T-Mobile's application, the Planning Staff stated that "the design of the tower structure is one of the least visually obtrusive types that can be installed in a residential area" and "the proposed tower will be located on a tract of land already heavily wooded, providing an immediate and effective vegetative screen." The Staff also stated that the "applicant has enhanced the aesthetic appearance of the tower structure as a result of choosing a less visually obtrusive structure, i.e. 'pine tree' style." The Planning Staff did recommend that a 50-foot landscape buffer be installed around the base of the tower and Plaintiff, while believing that to be unnecessary, has agreed to install the buffer. The Planning Staff also noted that T-Mobile had "demonstrated that no existing tower or structure is located within the geographic area required to meet the applicant's engineering requirements." Finally, the Staff stated that the "tower can be situated so that all existing residential units or other buildings in the area are a safe distance from the tower. The distance between the nearest residence and the tower is greater than the height of the tower including the antennas that will be permitted." The Planning Staff found, and there is no dispute that, T-Mobile's proposed location meets the zoning requirements of: being greater than 1.6 acres, within the 150-foot height limitation in the Rural Conservation Zoning District, meets setback requirements, and complies with security fencing requirements, and landscaping

4

requirements. The tower would sit approximately 373 feet from the residence on the property.

The Board held two public hearings on the application on December 13, 2007 and January 3, 2008. At the December 13, 2007 meeting, Board member Leigh Schlumper asked about T-Mobile's efforts to locate an alternative site for the monopine tower. T-Mobile's representative pointed the Board to the "Mittrix Memo" which was part of the company's zoning application packet. This memo, provided to Ed Trago, Real Estate & Zoning Manager, T-Mobile South LLC, and dated April 17, 2007, contained a map which showed that a total of seven properties had been considered. Three had been rejected as inappropriate because they were part of a subdivision. Four remained: T-Mobile had determined that Property No. 4 would be a potential location, but the property owner did not return T-Mobile's calls about a potential lease. T-Mobile was never able to gain access to Property No. 7 and could not determine who owned the property, and the owners of Property No. 2 told T-Mobile they were not interested. Property No. 1 had been considered but it would need additional variances and was determined to be too small for purposes of establishing a tower. The memo concluded by stating, "Until contact can be established with [owner of Property No. 4] to see if there is still interest, I cannot identify a property owner better suited for the T-Mobile application tha[n] our current candidate [Property No. 3]." Commissioner Schlumper asked the T-Mobile representative, Sarran Marshall, for

some kind of additional documentation concerning the other properties, such as written notification of lack of interest.

At the same hearing, Mr. Marshall stated that T-Mobile had received complaints from customers about coverage in the area and he also discussed the number of 911 calls in the target area. Commissioner Schlumper requested that T-Mobile provide documentation of these issues, particularly whether the coverage complaints came from individuals living in the area or people passing through in vehicles.

The only other individual to speak at the December hearing was Dana Harvey, who lived next door to the selected property and was, himself, a customer of T-Mobile. Mr. Harvey had lived at the property for fifteen years and had been a T-Mobile customer for eight. He stated that he had never had problems with getting coverage for his cell phone at his home and used the cell phone as his main business line. Mr. Harvey also testified that the proposed location would put the tower within 200 feet of his residence. After Mr. Harvey spoke, Mr. Marshall replied to his comments and noted that while there were some current pockets of coverage in the area which might lead Mr. Harvey to have cell phone service, the majority of individuals in the area would have problems making, receiving, or sustaining a call.

At the January 3, 2008 hearing, Mr. Marshall recalled the requests for additional information and stated that he had asked engineers to get him the number of complaints from

6

customers in the target area, but that the engineers told him this is not an accurate way of measuring service needs for that area. Rather, looking at the scope of coverage was a better way to determine where additional towers might be needed. Mr. Marshall reported that engineers would follow complaints in an area and look at the current equipment there to see whether it could be adjusted to handle the complaints, but that sometimes it is simply a lack of coverage, which the engineers determined it to be in this situation.

Mr. Marshall also stated that T-Mobile was not able to get additional written documentation from owners who did not want the tower located on their property. Often the owners would say they would not sign any documents and T-Mobile did not feel it appropriate to further pressure owners into signing a document expressing their lack of interest. Mr. Marshall then presented a notarized version of the Mittrix memo which had been discussed at the prior hearing. The Chairman then reminded Commissioner Schlumper that she had had "several questions at the previous meeting" and inquired whether the information provided by Mr. Marshall "addressed those questions" and Commissioner Schlumper stated it had and she had no further questions. No other Commissioners had questions for Mr. Marshall. The Board then voted unanimously to deny the application.

The Board submitted written documentation of that decision in a letter dated January 12, 2008. The Board stated the application had been denied because there was: (1) insufficient evidence for the need for a monopole telecommunications facility in the area;

(2) insufficient evidence that the subject property was the most suitable site; (3) insufficient evidence that the applicant determined the availability of all other potential sites in the area; (4) insufficient showing of lack of service in the area; (5) neighborhood opposition; and (6) aesthetics.

## B.    Contentions

Coweta County contends that the monopine tower would not significantly improve coverage in the area.  To support this conclusion, the Board points to the testimony of Dana Harvey and the Board's own comparison of the "before" and "after" coverage charts provided by T-Mobile showing how the tower would add coverage to that particular area of Coweta County.  The Board also argues that the tower would not address whatever coverage problems existed because it was not actually within the "search ring" proposed by T-Mobile – a circular ring with a perimeter .36 miles from the "ideal" location for a tower.  Rather, the location was shifted one-half mile northwest of the "ideal" location.  Because of this northwest shift, the Board contends that the service area also shifted and there would still remain an area not covered for service.  Coweta County also avers there are aesthetic concerns associated with the tower and notes that during the hearings that took place for the 2006 application, one neighbor testified that he was concerned that when winter arrived and the leaves fell off the tress, the tower would be more visible.  The Board also considered that

the proposed tower would be twice as tall as other trees in the area. Finally, Coweta County argues that T-Mobile did not adequately explore other options for placement of the tower.

T-Mobile responds that none of these reasons constitutes substantial evidence in the record because the Board's decision on the coverage issues is supported only by the statements of Mr. Harvey that he gets T-Mobile reception in his house and the Board's own thoughts on the coverage chart. T-Mobile further argues that the aesthetic concerns expressed by Mr. Harvey are too generalized to constitute substantial evidence and that the Board could not consider any statements made at hearings for T-Mobile's prior application. Finally, T-Mobile contends it provided notarized documentation of the other properties it considered before selecting the site on Fischer Road.

## II. Discussion

### A. Telecommunications Act of 1996

In *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210 (11th Cir. 2002), the Eleventh Circuit discussed extensively the application of the Telecommunications Act of 1996 in the local zoning context. The court found that the Telecommunications Act of 1996 was enacted "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapid private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." *Id.* at 1214 (citing House Report on the Act). The Act was

9

intended "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *Id.* "With respect to construction of telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communication services and the rebuilding of a digital technology-based cellular telecommunications network." *Id.* However, Congress also recognized that "there are legitimate State and local concerns involved in regulating the siting of such facilities . . ., such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way." *Id.* Thus, Congress enacted section 704(a) of the Act to "preserve the authority of State and local governments over zoning and land use matters except in . . . limited circumstances." *Id.*

Section 704(a), codified at 47 U.S.C. § 332(c)(7), describes certain substantive and procedural limitations on the authority of state or local governments to regulate the construction of facilities to be used for wireless communication. *Id.* at 1214-15. This section provides that any decision to deny approval for the "placement, construction, or modification of personal wireless service facilities" must be both "in writing and supported by substantial evidence contained in a written record." *Id.* at 1215 (citing 47 U.S.C. § 332(c)(7)(B)(iii)). A person adversely affected by such a decision may "within 30 days

10

after such action . . . commence an action in any court of competent jurisdiction." *Id.* (citing 47 U.S.C. § 332(c)(7)(B)(v)). The Eleventh Circuit describes this mechanism as "preserv[ing] local zoning authority over the siting of wireless facilities, while permitting judicial oversight as to the manner in which such decisions are made." *Id.* at 1216.

In *Preferred Sites*, the court also discussed the meaning of "substantial evidence" which was not specifically defined in the Telecommunications Act of 1996. *Id.* at 1218. The Conference Committee for the Telecommunications Act did state that the term is meant to be "the traditional standard used for judicial review of agency actions." *Id.* (quoting Conference Report). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Although the 'substantial evidence' standard is not as stringent as the preponderance of the evidence standard, it requires courts to take a harder look than when reviewing under the arbitrary and capricious standard." *Id.* (citing *Color Pigments Mfrs. Ass'n, Inc. v. OSHA*, 16 F.3d 1157, 1160 (11th Cir. 1994)). "Finally, to determine whether the substantial evidence standard is met, a court should view the record in its entirety, including evidence unfavorable to the state or local government's decision." *Id.*. (citing *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981)). "A court cannot substitute its own judgment for that of the local

11

board, but it must overturn the board's decision if the decision is not supported by substantial evidence." *Id.* at 1218-19.

In *Preferred Sites*, the Board denied the communications company's application for a conditional use permit to build a wireless communications tower. The court, however, noted that the minutes of the public hearing did not reflect any opposition to the application. The record did show the submission of five petitions purportedly against the tower. However, only two of those petitioners showed individuals' signatures and addresses. But those petitions did not indicate why the individuals opposed the towers. The court noted there was only this "scant evidence" of opposition, and therefore the Board's decision could not have been based on substantial evidence. *Id.* at 1219.

The court further stated, "citizens' generalized concerns about aesthetics are insufficient to constitute substantial evidence upon which the Board could rely. Aesthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the board." *Id.* (emphasis in original). "More generalized concerns regarding aesthetics, however, are insufficient to create substantial evidence justifying the denial of a permit under § 704(a) of the [Telecommunications Act.]" *Id. See also Group EMF, Inc. v. Coweta County*, 131 F. Supp. 2d 1335 (N.D. Ga. 2000) (Camp, J.) (denial of permit to construct tower not based on substantial evidence even where Board noted that structures on neighbor's property were within "fall zone" of tower, an existing

12

tower should have been considered for collocation, and the tower would cause an unnecessary flight risk because it was within 4,975 feet of a private airstrip and airstrip owner said it would interfere with operations, where company submitted voluminous documentation and testimony of engineer to show towers were not at risk to fall in one piece, but would rather crumble against itself; where engineer testified that coverage gap existed and that site suggested by Board would not solve coverage gap issue and no aspect of county ordinance required company to show other potential locations did not exist as a "legal matter" with court noting that even if Board disbelieved company's engineer "substantial evidence must exist in the record to support their disbelief" as "Board's suspicions" are not enough; and airspace specialist testified that tower would not interfere with private airstrip).

Compare *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757 (11th Cir. 2005) (although "blanket aesthetic objection does not constitute substantial evidence," "aesthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence," noting that "[a]lso relevant is whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns," and Board had before it testimony of resident and realtor about effect of tower on property values and negative testimony about site's proximity to middle school); *American Tower LP v. City of Huntsville*, 295 F.3d 1203 (11th Cir. 2002) (court found substantial evidence

existed in record to deny special exemption and variance because Huntsville's general zoning ordinance allowed Board to consider aesthetic effect and real estate agent testified that tower would lower property values and others testified that tower's proximity to two schools and several soccer fields rendered it unsafe); *Southeast Towers, LLC v. Pickens County*, 2008 WL 2064649 (N.D. Ga. May 13, 2008) (Story, J.) (despite fact that company obtained approval under National Historic Preservation Act and conducted "balloon test" to determine visibility, Board had substantial evidence of specific aesthetic concerns upon which to deny special use permit where numerous community members testified that the tower would have an adverse visual impact on the town's historic district and that impact would be even greater during fall and winter months when no foliage would be on trees; other community members protested the flashing red lights that would be on towers and that less obtrusive alternatives had not been considered by the company).

### B.    Application

The parties' main areas of disagreement surround whether there is substantial evidence that T-Mobile really needs the monopine tower in the selected area, whether alternative locations were considered, and whether there were legitimate aesthetic concerns.

#### 1.    Coverage Needs & Lack of Service & Whether Site was "Most Suitable"

No case in the Eleventh Circuit directly addresses conflicts in opinion on coverage issues. The Third Circuit has held that determinations "concerning the quality of existing

14

service must be based on substantial, competent evidence and remain subject to judicial review." *Cellular Tel. Co. v. Zoning Board of Adjustment of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999). Other courts have noted that a "decision that is based on the resolution of technical issues cannot be sustained under the substantial evidence standard where the determination was made based not on testimony and evidence in the record but rather on the adjudicator's own independent findings on the technical issues." *PrimeCo Personal Communications Ltd. P'ship v. City of Mequon*, 242 F. Supp. 2d 567, 577-78 (E.D. Wis. 2003) (rejecting city's argument that it was free to make a policy decision that sites providing certain percentage of coverage were adequate), *aff'd*, 352 F.3d 12147 (7th Cir. 2003) (Posner, J.). An "adjudicator's unsubstantiated belief is insufficient" under the substantial evidence standard. *Id.* at 578. *See also Verizon Wireless (VAW) LLC v. Douglas County*, 544 F. Supp. 2d 1218 (D. Kan. 2008) (holding that denial of permit was not based on substantial evidence where Board relied on testimony of Verizon customer in proposed area who stated she never had cell phone service coverage issues).

The court further notes that the decisions of the Board must be based on the requirements set forth in the local zoning ordinance. *See Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) ("When evaluating the evidence, local and state zoning laws govern the weight to be given the evidence" and Telecommunications Act does not "affect or encroach upon the substantive standards to be applied under established

15

principles of state and local law"). Thus, if a local ordinance does not require a provider to submit statistical evidence of dropped calls to establish inadequate levels of service, or the company to provide a "significant gap in coverage," the Board cannot base its denial on the failure of the company to provide such evidence.

The question here becomes whether (1) Mr. Harvey's testimony that he received coverage on his T-Mobile phone and (2) the Board's own visual comparison of coverage maps showing "before" and "after" scenarios with the addition of the proposed tower constitute "substantial evidence" upon which the Board could base its determination that T-Mobile had not demonstrated a coverage need in the area or that the proposed tower would address the coverage need. Associated with this issue is whether the Board could base its denial on its belief that the site was not the "most suitable"; that is, in the Board's opinion, the proposed placement of the tower outside the "ideal search ring" and the resulting area to the southeast of remaining coverage gaps.

The court finds that none of the arguments raised by the Board constitutes substantial evidence in the record. Nothing in Coweta County's Tower Ordinance requires T-Mobile to "prove" a coverage gap. T-Mobile submitted information from its engineers showing why they believe a gap to exist. T-Mobile also provided color maps to show the differences in coverage before and after construction of the tower. While it is true that all gaps in coverage are not solved by the construction of the tower at the proposed location, the maps

AO 72A
(Rev.8/82)

clearly demonstrate a substantial improvement in coverage. The fact that the tower does not eliminate every gap in coverage does not show that T-Mobile failed to demonstrate the need for the tower. T-Mobile's Engineering Analysis qualifies as technical evidence of the need for the tower. The Board's own personal conclusion that there is not sufficient improvement in coverage is not substantial evidence.[1] Similarly, while Mr. Harvey's testimony is relevant as a current T-Mobile customer, the "before" coverage map demonstrates that there could be areas of coverage in the "search ring" but a tower still be necessary to assure consistent and quality coverage.

For these reasons, the court finds the Board did not have substantial evidence in the record to determine that T-Mobile had not demonstrated a lack of coverage or that the tower location was not suitable in relation to the "search ring."

2. Alternative Locations

As the court outlined above, a representative of T-Mobile provided a notarized document indicating which of seven properties were pursued and which were not and the reasons therefore. Mr. Marshall further stated before the Board that T-Mobile did not require those property owners not interested in having a tower on their property to sign a

---

[1]The court notes there could be certain circumstances where the visual comparison of the "before" and "after" coverage charts might demonstrate such a lack of improvement that the Board could have substantial evidence to deny a tower in the selected location. The court finds that the comparisons here do not rise to that level.

17

document so stating. The only piece of property with no additional explanation is No. 4 where the owner would not return T-Mobile's calls.

The Board determined that T-Mobile had not provided sufficient evidence to show they have explored alternative areas. The question for the court is whether substantial evidence exists in the record for the Board to conclude that T-Mobile had not sufficiently explored other options. The court finds that there is not substantial evidence. In fact, the only evidence before the Board was a notarized statement by a T-Mobile representative identifying the other properties considered and explaining why they were not ultimately chosen. As the court noted in *Group EMF*, it is possible that the Board may choose to disbelieve T-Mobile's assertions with regard to the manner in which alternatives were explored, but there must exist "substantial evidence" in the record to support their disbelief, and "suspicions" of the Board are not enough. Here, there is no evidence before the Board to indicate that T-Mobile did not explore other options as attested to in the Mittrix Memo. There is no testimony, for example, from any property owners in the area to state that they were within the "search ring" yet T-Mobile did not inquire as to their interest in having a tower placed on their property. For these reasons, the court finds there is no evidence in the record to support the Board's finding that T-Mobile had not explored alternative locations.

AO 72A
(Rev.8/82)

### 3. Neighborhood Opposition & Aesthetics

In its written denial, the Board also refers to "neighborhood opposition" to the tower. The Board attached to its motion for summary judgment a transcript of the hearing for T-Mobile's 2006 application process which never reached completion. However, there is no evidence that this transcript was before the Board at either the December 13, 2007 or January 3, 2008 meetings. Further, there is nothing in the record to show that the makeup of the Board in 2007-2008 was the same as it was in 2006 such that the Board members might be assumed to recall the previous opposition. There is also nothing in the record to show that those opposed to the tower in 2006 were also opposed in 2007-08. T-Mobile did alter the visual appearance of the tower between the two applications, and there is nothing to show the court whether that alteration might have allayed concerns of those individuals opposed to the tower in 2006. For these reasons, the court finds that the neighborhood testimony in 2006 was not before the Board in 2007-2008 and therefore cannot form the basis for any "substantial evidence" the Board would have to deny the application in 2008.

However, the Board clearly had before it the testimony of Mr. Harvey in opposition to the tower. Mr. Harvey's concerns surrounded the fact that the "pine tree" disguise would not be effective and that the tower would be a steel structure with supporting equipment within close proximity to a neighborhood community. Mr. Harvey further stated he had concerns about property value, physical security, and noise and light pollution. He testified

19

that his property would be in the shadows of the tower and that his once "very private natural forest view from my family room will now be a tower, several supporting buildings, and a security fence." Mr. Harvey stated that he did not believe other properties had been considered and that "a short distance away" a sign indicated that property closer to the Fischer Road intersection was zoned C Commercial and that would be a better place for the tower. He concluded by stating, "I just think that this location is not the right location next to a 95 home community" and there would be no steps the Board or T-Mobile could take to make the tower acceptable to him.

Based on the case law described above, the court concludes that the aesthetic concerns raised by Mr. Harvey are "generalized" and therefore cannot form "substantial evidence." Mr. Harvey does not have any confirmation of the tower's visual impact, as did the plaintiffs in *Southeast Towers* who were able to demonstrate through balloon testing that the tower would be visible in the historic district. Mr. Harvey's concerns about steel structures in a neighborhood setting are classic "generalized" aesthetic concerns. He has made no effort to show that property values would diminish with the construction of the tower, unlike the plaintiffs in *American Tower* who had the testimony of a real estate agent that property values would decrease and others testifying that the proximity of the tower to schools and soccer fields would be unsafe. Further, the record demonstrates that because the tower would be under 150 feet, the Federal Aviation Administration would not require

AO 72A
(Rev.8/82)

it to be lighted, rendering Mr. Harvey's "noise and light pollution" concerns without any support in the record. Finally, Mr. Harvey's speculation that a property zoned C Commercial closer to Fischer Road would be more appropriate is simply his own speculation. There is no evidence in the record of what this property might be, whether it would be possible to obtain the proper zoning permission, whether it would expand coverage to underserved areas, or whether it would impact the coverage gap located by T-Mobile. There is no basis upon which the Board could consider this speculation. *See also PrimeCo*, 352 F.3d at 1150-51 (substantial evidence did not support denial on aesthetic grounds where only "evidence" regarding aesthetic considerations was testimony of three to four residents who said they did not like poles in general).

The court is mindful of the careful balancing that is required between the Telecommunications Act of 1996 and the prerogatives of local zoning boards. The court notes, however, that the substantial evidence standard was chosen for a reason and that the court must apply that standard to the decision of the local zoning board. In these circumstances, the court finds the Board did not have substantial evidence to deny T-Mobile's special use permit. The court turns now to the remedy.

## C.    Remedy

Section 704(a) of the Telecommunications Act of 1996 does not specify the appropriate remedy if a court determines that the local authority violated the requirements

21

of the Act. *Preferred Sites*, 296 F.3d at 1221. The statute specifies only that the "court of competent jurisdiction" must "hear and decide [an action arising from a violation § 704(a)] on an expedited basis." *Id.* (citing 47 U.S.C. § 332(c)(7)(B)(v)). The Eleventh Circuit recognized that other courts had approved issuing an injunction or other equitable relief "in the form of an order to issue the relevant permits" as a proper form of relief under § 704(a). *Id.* (citing cases from the First, Second, and Third Circuits). Therefore, the court concluded that "an injunction ordering issuance of a permit is an appropriate remedy for a violation of § 704(a)." *Id.* at 1222.

Here, Plaintiff's complaint contained two counts: (I) violation of the Telecommunications Act and (II) Injunctive Relief. As relief, Plaintiff asks the court to "issue an Order granting an injunction or other mandatory equitable relief compelling Defendant to issue the special use permit sought by Plaintiff." *See* Cmplt., Prayer for Relief, at 22. As it has been approved by the Eleventh Circuit as appropriate in section 704(a) cases, the court grants the requested relief.

## III. Conclusion

The court GRANTS Plaintiff's motion for summary judgment [13] and DENIES Defendant's motion for summary judgment [14].

Defendant Coweta County is ORDERED to issue T-Mobile a special use permit to construct the proposed 150-foot monopine pole on the property it has leased at 2288 Fischer

22

Road, Sharpsburg, Georgia, with the conditions set forth in the approval recommendation of Coweta County's professional Planning and Zoning Staff.

**IT IS SO ORDERED** this 5th day of March 2009.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)